# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel., | ) | |
| JOSEPH SMITH | ) | |
| | ) | |
| Petitioner, | ) | Case No. 00 C 4482 |
| v. | ) | |
| | ) | |
| JOHN EVANS, | ) | Judge Joan B. Gottschall |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Joseph Smith ("Smith") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons explained below, Smith's petition is denied.

## I.    Procedural History

In 1995, petitioner Joseph Smith was convicted in Cook County of first degree murder and attempted armed robbery, and was sentenced to concurrent terms of 55 years and 14 years imprisonment. Petitioner appealed to the Illinois Appellate Court and the judgment was affirmed on September 10, 1997. Petitioner filed a petition for leave to appeal to the Illinois Supreme Court, which was denied on March 31, 1999. Petitioner filed a postconviction petition on June 29, 1999. The circuit court dismissed the petition on July 16, 1999, finding that the claims were barred by *res judicata* or waiver. Instead of filing a timely notice of appeal, petitioner, on March 28, 2000, mailed a "Motion to Reconsider Postconviction Petition" to the clerk of the circuit court. This motion was denied on April 12, 2000. On May 23, 2000, petitioner submitted a late notice of appeal to the state appellate court; that court denied petitioner leave to appeal on June 16, 2000. On July 19, 2000, petitioner filed a federal habeas petition. On that same day, petitioner filed a motion to stay the proceedings until after his state court proceedings concluded. On August 16, 2000, petitioner moved

to voluntarily withdraw his petition. This motion was granted on February 2, 2001 (and the court denied as moot petitioner's motion to stay).

On December 21, 2000, petitioner filed a successive postconviction petition. On February 22, 2001, the circuit court dismissed the petition as frivolous and without merit. On July 25, 2001, petitioner filed a late notice of appeal, which was granted by the Illinois Appellate Court on August 2, 2001. On June 16, 2003, the appellate court found that the circuit court properly dismissed the successive postconviction petition. On July 10, 2003, petitioner filed a motion for extension of time to file a petition for leave to appeal in the Illinois Supreme Court. The Illinois Supreme Court granted the motion on July 22, 2003, but denied the petition for leave to appeal on October 7, 2003.

On December 16, 2003, this court allowed petitioner to reinstate his case and file an amended federal habeas petition. On April 1, 2004, petitioner filed his amended petition. On July 8, 2004, respondent moved to dismiss the petition on the ground that it was untimely. On March 7, 2005, the court denied the motion. On June 11, 2007, the court appointed counsel to represent petitioner, and petitioner filed an amended petition on July 24, 2007. In his amended petition, petitioner raises the following claims: (1) trial counsel was ineffective for failing to object to an improper jury instruction concerning how to weigh identification testimony of a witness; (2) trial counsel was ineffective for failing to interview and present at trial alibi witnesses; (3) appellate counsel was ineffective for not arguing on appeal that the trial court erred in denying petitioner's motion to strike eyewitness Charles Queen's in-court identification and his motion for a mistrial; (4) the state violated the Confrontation Clause by eliciting testimony from Detective Duffin that led to the inference that petitioner's co-defendant implicated petitioner in the shooting. On June 20, 2008, the respondent filed its answer.

## II.    Factual Background[1]

At trial, the state presented the testimony of three eyewitnesses:  Robert Severson, Dale Sramek, and Charles Queen.  Severson testified that at 10:30 p.m. on April 6, 1992, the night of the shooting, he went to a tavern to drink a couple of beers with his friend Danny Sheehan.  As they were driving home, sometime around midnight, they drove by the intersection of 47th Street and Leamington where they saw some friends, including the victim Frank Miranda, standing by a closed hot dog stand.  Severson stopped to talk with his friends, who told him that they were standing there to get drugs.  According to Severson, his friend Charles Queen drove up shortly thereafter, and gave Severson $60 to use to purchase drugs should the opportunity arise.

Severson further testified that a black male then approached him and Frank Miranda and asked them if they wanted to buy some rock cocaine.  Severson said yes, and the man stated that he would be back with some cocaine in about ten minutes.  The man then walked away, and returned several minutes later with another black male.  However, the two men did not proceed all the way to the hot dog stand where Severson and his friends were standing, but, rather, stopped in a vacant lot across the intersection of 47th and Leamington, and called over to Severson and his group of friends.  Severson and Queen then began walking over to the vacant lot to purchase their drugs, but Frank Miranda ran ahead of them in order to be the first one to get the drugs.  Severson then saw one of the two black men pull out a shotgun from beneath his trench coat, and called out to warn Miranda about the gun.  The man with the shotgun then told Miranda, "give me your money," and Miranda said "Fuck you," turned around, and started to walk back over to the hot dog stand.  The

_____

[1] The court takes its facts from the Illinois Appellate Court's recitation of facts in *People v. Smith*, No. 1-95-2553 (Ill. App. 1997).  *Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006) (state court factual determinations are presumed correct and can only be rebutted with clear and convincing evidence).

man with the shotgun then shot Miranda in the back. The two men then fled the scene.

Severson ran back to a telephone located next to the hot dog stand to call the police, while Queen went to assist Frank Miranda, who was lying on the ground and bleeding heavily. After calling the police, Severson left the scene and went to a bar. While at that bar, Severson called Christine Quinn, the victim's sister, and told her that he had heard her brother had been shot. Severson admitted that he lied to Ms. Quinn, and explained that he did not tell her that he was present at the scene of the shooting because he did not want to be implicated therein and because he did not want Ms. Quinn's husband to hesitate in hiring Severson should he have work for Severson to do. Severson also stated that he did not talk to the police immediately after the shooting because there was a warrant out for his arrest for missing a court date pursuant to a retail theft charge and he did not want to spend the night in jail.

Severson further testified that on May 16, 1992, the police came to his house and asked him if he would be willing to view a lineup and discuss the murder of Miranda. He had not spoken with the police before that date about this case, and agreed to accompany the police to the station. On the way, he admitted to the officers that he had witnessed the shooting. He then viewed a lineup in which he identified codefendant Antoine Edwards as the man who first approached Severson and his group of friends prior to the shooting. Several hours later, Severson identified petitioner as the gunman in the shooting in an array of photographs and then in a lineup. Severson also identified petitioner in court as the man who killed Miranda.

The state then called Dale Sramek to the stand. Like Severson, Sramek testified that he had gone to the closed hot dog stand on the night in question to purchase drugs. His testimony as to the events surrounding the shooting was substantially the same as Severson's. In addition, Sramek

testified that prior to the shooting, between 7 p.m. and midnight, he, his girlfriend, and the victim had been smoking crack cocaine, and that he had had approximately 50 "hits" off of a crack cocaine pipe that evening. Sramek also stated that at the time of the shooting, he was too far away from the gunman to see his face. After the shooting, Sramek pursued the offenders in his car, at which point he returned to the crime scene, where he encountered the dead victim, his girlfriend, Charles Queen, and the police. At that time, Sramek did not tell the police that he had been present at the scene because he was afraid of being implicated in a drug deal, but, rather, stated that he had merely been driving by when he noticed a commotion. He did not tell any police officers or prosecutors that he had actually been at the scene of the shooting until shortly before giving his trial testimony.

The state then called Charles Queen to the stand. Queen's testimony as to the events leading up to and including the shooting was substantially the same as that of Severson and Sramek. Queen stated that on the night in question, at approximately 11:30 p.m., he was on his way home from work with his girlfriend when he stopped at the closed hot dog stand to buy drugs. Queen said that as he and Severson were walking towards the two offenders and came within 25 feet of them, he saw the taller of the two offenders produce a shotgun. Queen further testified that he identified the shooter to a police officer who came to the scene as having had a long jacket on and as being approximately six feet tall and having dark skin. Queen also identified petitioner in court as the man who shot Miranda on the night in question.

The state also called Chicago Police Department Officer Thomas Paszkowski to the stand. Officer Paszkowski testified that he was summoned to the scene of the shooting. When he arrived, he saw Miranda lying in the vacant lot and bleeding heavily from his lower back, and Charles Queen attempting to stop the blood flow. Sramek then gave a description of the two offenders to Officer

Paszkowski as two black males, one between 22 and 28 years old who was approximately 5 feet, 8 inches tall and wearing a gray jacket with a hood, and the other between 18 and 22 years old, wearing a light-colored jacket and yellow pants.

Chicago Police Department Officer John Kosiewicz then testified that on May 16, 1992, more than five weeks after the murder, he responded to a call regarding a disturbance at 4900 West 44th Place in Chicago. Upon arriving at that location, Kosiewicz heard shots and saw two black males running away from a Chicago Housing Authority ("CHA") security guard. Kosiewicz and other officers pursued the two men on foot, and reached the CHA security guard after he had apprehended one of the subjects, codefendant Antoine Edwards. Kosiewicz then took Edwards into custody and learned that he lived near the scene of the shooting of Miranda. Kosiewicz had heard about the Miranda shooting and knew that it had involved a shotgun and two black males in their late teens or early twenties who fled from the murder scene through an alley adjoining Edwards' home, and therefore notified detectives investigating the Miranda murder that he might have one of the offenders in custody.

The state then called Chicago Police Department Detective Michael Duffin who testified that on May 16, 1992, he was assigned to work on this case with Detective Albert Graff. After several unsuccessful attempts at contacting various alleged eyewitnesses to the Miranda murder that evening, the detectives located Severson, whom they brought in to view codefendant Antoine Edwards in a lineup. According to Duffin, Severson identified Edwards in that lineup as the accomplice of the man who shot Miranda. Duffin testified that he then had several conversations with Antoine Edwards over a four-hour period, and thereafter drove with Edwards and Detective Graff to several locations. They first went to petitioner's house, where Duffin spoke with petitioner's

older brother, Willie Smith. Willie Smith advised Duffin that petitioner was not home and provided Duffin with a photograph of him. Duffin left a business card with Willie Smith and then he, Graff and Edwards went to the house of Antoine Crawford. They then went to the home of Crawford's cousin, to look for the shotgun used in the murder. Duffin advised a woman at the latter residence that he had information that a shotgun was sold to her son, Antoine Crawford's cousin, for $20, and that he believed that the gun was in the house. The woman refused to consent to a search of the house. Duffin returned to the police station and placed the photograph of petitioner into a photographic array which he showed to Severson, who identified that photo as being that of the shooter. After petitioner called Duffin, he agreed to come into the station, at which time Severson identified petitioner in a lineup as the person who shot Miranda.

Duffin further testified that he and assistant state's attorney James Sullivan met with petitioner, who at first denied any involvement in the shooting but then confessed. In his oral confession to Duffin and Sullivan, petitioner stated that on the night of April 6, 1992, he had been drinking at home and had an argument with his mother and brother. He later went over to codefendant Antoine Edward's house, at which time Edwards told him that there were some white guys standing outside at 47th and Leamington who were trying to buy some drugs and whom Edwards wanted to rob. He and Edwards then proceeded to that location. On the way, petitioner took the shotgun that Edwards was carrying and removed the safety. When they arrived, petitioner saw some white guys and called them over. He pointed the shotgun at the stomach of one of them who came up to him and then demanded his money. The individual panicked, denied having any money, and began to walk away, at which time Antoine Edwards said, "Shoot him," and petitioner did. Antoine Edwards, together with Antoine Crawford, took the murder weapon over to Crawford's

cousin's house to get rid of it. Duffin further testified that petitioner refused to sign a written statement, but that Duffin took notes of petitioner's statement. Codefendant Edwards and Antoine Crawford then gave written statements to Duffin and Sullivan.

Finally, the state called former state's attorney James Sullivan to the stand. Sullivan's testimony was substantially the same as that given by Duffin. In addition, Sullivan stated that when he and Duffin took petitioner's oral statement, petitioner told them that on the evening of the shooting he was upset because he had no money. Petitioner also told them that when he arrived at Edwards' house, Edwards went out to use the public telephone at 47th and Leamington, and that when he returned, he told petitioner that there were people out there whom they should rob. Petitioner agreed to be the one to commit the robbery, and took Edwards' shotgun from Edwards, which he ultimately used to kill Miranda. Sullivan also recorded petitioner's confession in written notes.

In his case-in-chief, petitioner testified and denied any involvement in the murder and denied ever making any confession to Duffin and Sullivan. He testified that he is six feet, three inches tall and weighs 185 pounds, and that on April 6 and 7, 1992, he was 17 years old and was a high school student living with his mother. Petitioner testified that he was at home studying on the night of the shooting. Petitioner further testified that in 1991, codefendant Edwards "pulled a pistol" on him, apparently because Edwards suspected that petitioner was involved with Edwards' girlfriend.

After deliberating for approximately fours hours, the jury sent the judge a note indicating that it could not come to an agreement after four votes. The judge instructed the jury to continue deliberating and, soon thereafter, because it was 10:00 p.m., the jury was sequestered. The following day, the jury returned with a guilty verdict against petitioner for first degree murder and

attempted armed robbery. The trial court sentenced defendant to concurrent prison terms of 55 years for murder and 14 years for attempted armed robbery.

## III.    Analysis

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 367 (2000). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 404. To demonstrate an "unreasonable application" of clearly established federal law, a habeas petitioner must establish that the state court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous. Rather, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (state court decision must lie "well outside the boundaries of permissible differences of opinion").

Before a federal court will consider a habeas corpus petition, a petitioner must satisfy several procedural requirements. Each claim must be presented on appeal to the Illinois Appellate Court and in a petition to the Illinois Supreme Court for discretionary review. *See, e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). To satisfy this requirement, a petitioner must fairly present to the state judiciary both the operative facts and legal principles that control each claim. *Wilson*

*v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001). A petitioner's failure to fairly present each habeas claim to the state's appellate and supreme court in the time and manner required leads to a default of the claim, thus barring the federal court from reviewing the claim's merits. *Boerckel*, 526 U.S. at 848. In addition, a federal court may not review a claim which was presented to the state courts but which was rejected on an independent and adequate state ground. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). A federal court, however, may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Id.* at 750.

### A.    Ineffective Assistance of Counsel

### 1.    Jury Instruction Error

Petitioner's first basis for alleging ineffective assistance of counsel is based on his trial counsel's failure to object to an improper jury instruction concerning the standard for assessing eyewitness testimony. Respondent argues that this claim is procedurally defaulted for two reasons: (1) the state appellate court held on successive postconviction appeal that it was forfeited; and (2) petitioner failed to present this claim to the Illinois Supreme Court in his postconviction petition for leave to appeal ("PLA").

A federal court will not review a question of federal law decided by a state court if that decision rests on state law grounds that are independent of the federal question and adequate to support the judgment. *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 556 (7th Cir. 2001). A state law ground that provides the basis for a state court decision is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case. *Id.*

(citing *Harris v. Reed*, 489 U.S. 255, 261 (1989)). A state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied. *Franklin v. Gilmore*, 188 F.3d 877, 882 (7th Cir. 1999).

The key issue here is whether or not the state appellate court actually relied on forfeiture in dismissing petitioner's jury instruction claim. In the state court, petitioner argued for the first time in his successive postconviction appeal that his trial counsel was ineffective for failing to object to an erroneous jury instruction. The parties dispute whether or not the state appellate court relied on forfeiture for its dismissal, or actually reached the merits of the claim. Petitioner urges the court to conclude that the procedural state bar was not "independent" because the state appellate court reached the merits of the ineffective assistance claim.

Having reviewed the appellate court's opinion, the court agrees with respondent that the appellate court denied this claim on the basis of a state statutory forfeiture rule – that is, claims not raised in an initial postconviction petition are forfeited unless a defendant can show cause and prejudice, thereby allowing excusal of the forfeiture under the "fundamental fairness" doctrine. *See* 725 ILCS 5/122-3 ("Waiver of Claims. Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."). After discussing the fact that petitioner could only avoid forfeiture by showing cause and prejudice, the court stated, "Regarding the cause prong, we discern no reason why this issue could not have been raised in defendant's first petition. In fact, defendant had three opportunities to previously raise this claim – on direct appeal, in his first post-conviction petition, and in his second post-conviction petition." *People v. Smith*, 794 N.E.2d 367, 383 (Ill. App. Ct. 2003). Then the court concluded that petitioner also failed to show prejudice "due to the overwhelming nature of the evidence presented against him. For the same reason, the

claim would fail even if reviewed on its merits." *Id.* In conclusion, the court stated that "this claim

is waived and would fail even if reviewed on its merits." *Id.* When read in context, a close reading

of the opinion reveals that the court's discussion of prejudice arose not in the context of the merits

of the ineffective assistance claim, but rather in the court's analysis of whether petitioner could rely

on cause and prejudice to avoid the forfeiture. This court concludes that the state appellate court

relied upon forfeiture as the basis for its decision, and only made a conclusion regarding the merits

of the claim as an alternative holding. Such a "dual-ground" holding acts as an independent and

adequate[2] state ground because the state court clearly and expressly relied upon the state ground as

the primary basis for its decision. *See, e.g., Burris v.* Farley, 51 F.3d 655, 660 (7th Cir. 1995) ("a

dual-ground decision shows that the judgment rests on an independent state ground and is insulated

from federal review).[3]

Further, this ineffective assistance claim is procedurally defaulted for another reason;

petitioner did not raise it before the Illinois Supreme Court, thus failing to raise this claim in a full

round of appellate review. *Boerckel*, 526 U.S. at 845-46 (requiring a full round of appellate review

in collateral proceedings). In filing his PLA with the Illinois Supreme Court, petitioner raised only

---

[2] Petitioner does not argue that the forfeiture rule is not "adequate." In fact, the statutory forfeiture rule concerning successive postconviction petitions is a firmly established and regularly followed state practice. *See, e.g., Szabo v. Walls*, 313 F.3d 392, 396 (7th Cir. 2002); *People v. Free*, 522 N.E.2d 1184 (Ill. 1988).

[3] Petitioner's heavy reliance on *Moore v. Bryant*, 295 F.3d 771 (7th Cir. 2002) is not persuasive. After the district court dismissed petitioner's habeas claims based on the fact that the state appellate court relied on waiver for its dismissal, the Seventh Circuit reversed. While the state appellate court on direct appeal mentioned waiver as a basis for dismissal, the state courts, on collateral review, did not treat his claims as being waived, and instead analyzed the claims on their merits. *Id.* at 775. While the Seventh Circuit acknowledged that use of the phrase "even if," in prefacing a merits discussion, usually indicates an alternative holding, it did not in *Moore* due to the subsequent treatment of the claims during collateral review. Here, there were no subsequent state courts which analyzed petitioner's claims on the merits.

questions regarding the application of Illinois' Post-Conviction Hearing Act. For this additional reason, petitioner's jury instruction claim is procedurally defaulted.

In order to avoid the effects of procedural default, petitioner must either show cause and prejudice or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. "Cause" for a procedural default exists if the petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Petitioner argues that the cause requirement is met because his trial and appellate counsel were ineffective for failing to raise the jury instruction claim. Although it is true generally that ineffective assistance rising to the level of a constitutional violation can constitute "cause" sufficient to excuse a procedural default, *Murray*, 477 U.S. at 488, petitioner's argument has no merit. Merely restating the underlying ineffective assistance claim does not show "cause" for the default. In other words, it does not explain why petitioner could not have avoided forfeiture by including his ineffective assistance claim in his original postconviction petition.

Finally, petitioner argues that he should be permitted to avoid the procedural default bar because he has shown a "fundamental miscarriage of justice," or, in other words, that he is actually innocent of the crimes. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995) (stating that the fundamental miscarriage of justice exception, which is "extremely rare," applies only where "a constitutional violation has probably resulted in the conviction of one who is actually innocent"). In order to demonstrate actual innocence in a collateral proceeding, a petitioner must present "new reliable evidence that was not presented at trial" and "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* at 327-28. The court must consider all of the evidence "old and new, incriminating and exculpatory, without regard to whether

it would necessarily be admitted under rules of admissibility that would govern at trial[.]" *House v. Bell*, 547 U.S. 518, 538 (2006). As the *House* Court explained, "[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. If new evidence so requires, this may include consideration of 'the credibility of the witnesses presented at trial' as well as the likely credibility of the [new] affiants." *Id.* at 538-39 (quoting *Jackson v. Virginia*, 443 U.S. 307, 330(1979)).

To support his actual innocence argument, petitioner puts forward two new affidavits. In the first, Mark Sims avers that he was available as a witness during the criminal trial, was willing to testify, and would have testified as an alibi witness that he saw petitioner in petitioner's mother's apartment on April 6, 1992 "in the latter part of the hour of 11 p.m." Sims Aff. at 1. In the second affidavit, Michael L. Williams avers that he witnessed the shooting and that the gunman was not petitioner. Rather, according to Williams, the gunman was Tarico "Snake" Miller, who fled the scene with Antoine Edwards. Finally, in an attempt to show that the evidence was closely balanced, petitioner points to the fact that the jury sent the trial judge a note saying that they were deadlocked after four votes approximately four hours after beginning deliberations.

Despite the introduction of two additional witnesses who would have buttressed petitioner's testimony that he was not the shooter and was at his mother's apartment studying at the time of the shooting, the court cannot conclude, as it must in order to find "actual innocence," that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *Schulp*, 513 U.S. at 327-28, even in light of the new evidence. The Seventh Circuit's opinion in *Hayes v. Battaglia*, 403 F.3d 935 (7th Cir. 2005), is instructive here. In that case, Hayes attempted

to argue that his procedurally defaulted claims should not be barred because he was actually innocent. In support, he claimed that there were six alibi witnesses who could have been called at trial. The Seventh Circuit concluded, in light of the six eyewitnesses to the crime who did testify at trial, that the introduction of the alibi eyewitnesses "would at best have produced a draw: six eyewitnesses identify Hayes as the culprit, six others exculpate him. . . . [I]t is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar." *Hayes*, 403 F.3d at 938 (citation omitted). The court continued, "To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Id.*

Although the new evidence presented here may have been beneficial to petitioner if it was presented at trial, it is not sufficient to warrant applying the "extremely rare" actual innocence exception when considered in tandem with the other evidence that was presented at his trial. The court concludes that a rational juror might well have disbelieved the additional witnesses, in light of the eyewitness testimony and petitioner's oral confession. The state appellate court found the evidence in this case to be "overwhelming" and this court agrees that there was strong evidence against petitioner. *See Toliver v. Hulick*, 470 F.3d 1204, 1209 (7th Cir. 2006) (stating that confession is "strong evidence of guilt"). The fact that the jury did not reach a unanimous verdict within the first four hours of deliberation does not convince this court that the evidence was closely balanced. Petitioner's confession was consistent with the testimony of the three eyewitnesses, and together with the eyewitness testimony, provides powerful evidence from which a reasonable juror could conclude petitioner was guilty of the crimes charged. In the end, petitioner has failed to put

forward sufficient evidence of actual innocence required to meet the high hurdle outlined in *Schlup*, *Hayes* and *House*. *See, e.g., Badelle v. Correll*, 452 F.3d 648, 661 (7th Cir. 2006) (actual innocence claim denied where petitioner was positively identified by two witnesses who spent time with him on day of murder); *U.S. ex rel. Ruddock v. Briley*, 216 F. Supp. 2d 737, 744-45 (N.D. Ill. 2002) (rejecting claim of actual innocence based on alibi witness concluding that a reasonable jury might have disbelieved alibi witness in light of eyewitness testimony).

### 2.    Failure to Call Witnesses

The second basis for petitioner's ineffective assistance of counsel claim is that his trial counsel was ineffective for failing to call Michael Williams, who would have testified that another individual was the shooter, and Mark Sims, who would have been an alibi witness.  On appeal from the denial of his successive postconviction petition, petitioner stated his alibi witness claim differently, arguing that his counsel was ineffective for failing to investigate his alibi and for failing to call unnamed alibi witnesses, including some of his neighbors, who would have provided him with an alibi.  In addition, petitioner argued before the state appellate court that his trial counsel was ineffective for failing to call Williams, who would have testified that petitioner was not involved in the shooting.  In his amended federal petition, petitioner combines these two separate claims into one.  The court will address each separately.

### a.    Williams

With respect to counsel's failure to present Williams as a defense witness, the state appellate court held that it was forfeited because "this claim was not raised in defendant's original petition and we can discern no reason why the issue could not have been raised at that time, given defendant's allegation that Williams had been known to the defense at the time of trial.  Therefore, the claim is

waived." *Smith*, 794 N.E.2d at 381. After concluding that petitioner's claim was forfeited because he could not show "cause" for failing to bring the claim in his original postconviction petition, the court also discussed the fact that petitioner failed to show prejudice. This discussion of prejudice was directed to the state court rule that forfeiture may be overcome if cause and prejudice are shown. As with the jury instruction claim, the main reason the appellate court rejected the ineffective assistance of counsel claim based on a failure to call Williams was because petitioner forfeited it by not including it in his initial postconviction petition. The court's discussion of prejudice is tied primarily to the issue of cause and prejudice, and any discussion of prejudice as it relates to the substantive ineffective assistance claim is secondary to the court's holding of forfeiture. Such a "dual-ground" holding acts as an independent and adequate state ground because the state court clearly and expressly relied upon the state ground as the primary basis for its decision. *See, e.g., Burris*, 51 F.3d at 660.

Further, this claim as it relates to Williams is procedurally defaulted for a second reason – it was not raised for a full round of appellate review. *Boerckel*, 526 U.S. at 845-46. While petitioner's postconviction PLA did not identify this basis as one of his "compelling reasons for granting review," Exh. P at 3, the body of the PLA does reference the factual basis for this claim. However, the PLA makes no mention of the controlling federal legal principles.

Where a claim is not clearly identified to the state courts as a federal constitutional claim, the Seventh Circuit uses a four-part test to determine whether a petitioner has fairly presented that claim: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific

constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001). The presence of any one of these factors does not avoid a waiver; the court must consider the facts of each case. *Momient-El v. DeTella*, 118 F.3d 535, 538 (7th Cir. 1997). The critical question is "whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Ellsworth*, 248 F.3d at 639.

First, petitioner did not rely on any federal cases in his successive postconviction PLA. Nor did petitioner rely on state cases that applied a constitutional analysis to similar facts. Petitioner's only mention of federal constitutional principles in his PLA is the Fifth Amendment's protection against self-incrimination; his PLA is silent on the issue of effective assistance of counsel. The PLA addresses whether a trial court can summarily dismiss a successive postconviction petition on forfeiture grounds, and does not even cursorily discuss counsel's performance. The PLA was not phrased to call to mind a specific constitutional right, nor does it present a pattern of facts in the mainstream of federal constitutional litigation. In his PLA, petitioner presented only an issue of state law, and therefore the Illinois Supreme Court had no reason to suspect that petitioner was raising a federal constitutional claim. As respondent correctly points out, the fact that petitioner argued his federal constitutional claim to the appellate court does not change the analysis; a claim is not fairly presented as a federal constitutional claim to a state's highest court when it is argued as such only in a brief submitted to a lower court. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Thus, petitioner has defaulted this claim for failing to present it for review in his successive postconviction PLA.

**b.     Sims**

While the issue of alibi witnesses in general was presented to the state appellate court, petitioner never identified any particular alibi witness his counsel should have called. He now argues that his counsel was ineffective for failing to investigate and call Mark Sims, who would have provided petitioner with an alibi for the time of the shooting. Because Sims was never presented to a state court as a potential alibi witness, the court must determine whether or not this claim has been "fairly presented" to the state courts. *See Ellsworth*, 248 F.3d at 639. In making this determination, the court must "avoid hypertechnicality." *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992). In light of the fact that petitioner argued generally that alibi witnesses were available at trial, and the fact that Sims is one such witness, the court concludes that the "substance" of this federal claim was presented to the state courts. *See Picard v. Connor*, 404 U.S. 270, 277-78 (1971) ("Obviously there are instances in which the ultimate question for disposition will be the same despite variations in the legal theory or factual allegations urged in its support. . . . We simply hold that the substance of a federal habeas claim must first be presented to the state courts.").

However, this matter gets more complicated because petitioner's ineffective assistance of counsel claim based on trial counsel's failure to call alibi witnesses is procedurally defaulted. In dealing with this claim, the Illinois Appellate Court dismissed it because petitioner did not provide the names of the alleged alibi witnesses, nor did he attach their affidavits to his petition. In dismissing the claim, the appellate court relied on the Illinois Post-Conviction Act which mandates that a postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." *Smith*, 794 N.E.2d 382 (citing 725 ILCS 5/122-2 (West 2000)). The fact that petitioner has now identified Sims as one such alibi witness does not change the fact that he never identified an alibi witness for the state courts,

and the appellate court relied on that fact to dismiss the claim for failure to comply with the mandates of the Illinois Post-Conviction Act. This claim, therefore, is procedurally defaulted because the state court relied on an independent and adequate state ground for dismissal. *Barksdale v. Lane*, 957 F.2d 379 (7th Cir. 1992) (finding that noncompliance with Illinois Post-Conviction Act presents an independent and adequate state ground). Petitioner makes no argument whatsoever on this point and the court is unaware of any way, other than a showing of cause and prejudice, or actual innocence, which would allow the court to address the claim as it relates to Sims.

### c.      Cause and Prejudice Test for Williams and Sims

Petitioner's combination of the Williams' and Sims' claims forces the court to address these issues together in discussing whether or not petitioner can avoid the procedural bar. As has already been discussed, petitioner has failed to show actual innocence. With respect to cause and prejudice, petitioner makes a nonsensical argument. Specifically, petitioner argues that he has shown "cause" for the default because his trial counsel was ineffective for failing to call alibi witnesses. This argument misses the point in that trial counsel's failure to call Williams and Sims does not explain: (1) petitioner's failure to include the Williams' claim in his original postconviction petition, (2) why he failed to include the Williams' claim in his successive postconviction PLA to the Illinois Supreme Court; or (3) why he failed to identify Sims and include his affidavit before the state court. Further, to the extent petitioner argues that his legal inexperience qualifies as cause for this default, this argument has been rejected by the Seventh Circuit. *See, e.g.*, *Harris*, 334 F.3d at 669 (rejecting idea that habeas petitioner's *pro se* status constitutes cause). In light of this, petitioner's ineffective assistance of counsel claim based on counsel's failure to call Williams and Sims is procedurally defaulted, and may not be considered by this court.

## B. Ineffective Assistance of Appellate Counsel

Next, petitioner argues that his appellate counsel was ineffective by failing to argue that the trial court erred in: (1) overruling trial counsel's objection to Queen's identification of petitioner; (2) denying petitioner's motion to strike Queen's testimony; and (3) denying petitioner's motion for a mistrial. Again, respondent argues that this claim is procedurally defaulted.

Petitioner first raised this issue in his successive postconviction petition. In turning to this claim, the appellate court stated,

> Lastly, we find that defendant cannot satisfy the cause and prejudice test regarding his contention that his appellate counsel was ineffective. Defendant argues his appellate counsel provided him with deficient representation because he did not raise on direct appeal the trial court's error in overruling defendant's objection to Queen's in-court identification, his motion to strike Queen's testimony and his motion for a mistrial. Again, defendant fails to establish cause for not raising these claims in his initial post-conviction petition, as all of these claims could have been raised at that time.

*Smith*, 794 N.E.2d at 383-84. This court acknowledges that the appellate court does not use either "forfeiture" or "waiver" in its discussion of this claim. However, the appellate court's analysis of cause and prejudice in the first sentence in the quoted paragraph above makes clear that the court is starting with the premise that the claim has been forfeited. There would be no need to discuss cause and prejudice if there were no forfeiture in the first instance. Having concluded that petitioner failed to show cause for his failure to include the claim in his original postconviction petition, the court then went on to state that petitioner failed to show prejudice, both in the context of the cause and prejudice test, as well as under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In light of the fact that the court began its discussion of this claim with a discussion of whether or not petitioner could satisfy the cause and prejudice test, which is necessarily based on a finding of forfeiture, the court concludes that the appellate court's primary holding was that the claim was forfeited. This

holding is an independent and adequate state ground which bars federal review. As with the appellate court's discussion of petitioner's other claims, the court's secondary discussion of the merits of the claim is an alternate holding which does not undermine its procedural ruling. *Moore v. Bryant*, 295 F.3d 771, 775 (7th Cir. 2002).

Finally, this claim based on appellate counsel's ineffectiveness is procedurally defaulted for a second reason. Petitioner failed to raise this claim in his PLA to the Illinois Supreme Court, and thus the claim is barred. *Boerckel*, 526 U.S. at 848.

In order to avoid procedural default, petitioner must show cause and prejudice for this default, or show actual innocence. Petitioner argues that he can show cause "because his appellate counsel was ineffective for failing to argue that the trial court erred in overruling trial counsel's objection to Queen's identification, and that appellate counsel was ineffective for failing to argue that the trial court erred in denying petitioner's motion to strike Queen's testimony and his motion for mistrial." Reply at 7. Once again, petitioner merely recites his underlying ineffective assistance claim as the "cause" for his default. This is insufficient and fails to explain why petitioner failed to include the claim in his original postconviction petition, and why he failed to include the claim in his successive postconviction PLA before the Illinois Supreme Court. In addition, as discussed earlier, petitioner has failed to put forward evidence sufficient to prove his actual innocence.

### C.    Confrontation Clause

Petitioner claims that his Sixth Amendment Confrontation Clause rights were violated when the state elicited testimony from Detective Duffin which led to the inference that codefendant Antoine Edwards, who did not testify at trial, implicated petitioner in the shooting. Respondent argues that this claim is procedurally defaulted.

Petitioner first raised this issue on direct appeal, where the state appellate court held that petitioner forfeited this claim by failing to object at trial or raise this issue in a post-trial motion. After discussing the factual basis of the claim, the appellate court stated, "We first note that the defendant failed to object to the subject testimony during trial, and did not address the issue of Detective Duffin's trial testimony in any post-trial motion. Therefore, this contention is waived on appeal." *People v. Smith*, No. 1-95-2553, at 15-16 (Ill. App. Ct. 1997) (citing *People v. Jefferson*, 631 N.E.2d 1374 (1994) (both a trial objection and a written post-trial motion raising an issue are required to prevent its waiver on appeal)). Having found forfeiture, the court stated that "Moreover, even without the invocation of waiver, this contention is without merit." *Id.* The appellate court went on to conclude that the testimony at issue was not hearsay, but rather admissible testimony listing the investigative steps taken by Detective Duffin.

In its analysis of this claim, the appellate court unambiguously determined that this claim was forfeited for failure to object at trial or raise the claim in a post-trial motion. Only after concluding that the claim was forfeited did the court discuss its alternative holding that, even if the claim were not forfeited, it lacked merit. Because the court relied primarily on the independent and adequate state ground of waiver, this court may not review the claim. *Alwoli v. Gilmore*, 127 F.3d 633, 634 (7th Cir. 1997) ("It is well settled that a failure to object at trial or in a post-trial motion" constitutes an independent and adequate state ground).

Petitioner makes no argument that he can show cause and prejudice to overcome this default. In addition, the court has already ruled that petitioner's actual innocence argument fails. In light of this, petitioner's confrontation clause claim is procedurally defaulted.

## IV.    Evidentiary Hearing

Finally, the court addresses petitioner's request for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan,* 550 U.S. 465, 127 S.Ct. 1933, 1940 (2007). As discussed above, petitioner's claims were subject to forfeiture in the state court, and an evidentiary hearing before this court could not alter that analysis. With respect to his allegations of actual innocence, the court does not find that an evidentiary hearing is necessary, nor has petitioner made the requisite showing under 28 U.S.C. § 2254(e)(2).

## V.     Conclusion

For all the foregoing reasons, petitioner Joseph Smith's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  January 26, 2009